# COUNTY OF MILWAUKEE, Petitioner-Appellant-Petitioner,

## v.

# LABOR & INDUSTRY REVIEW COMMISSION and Stephan M. Serebin, Respondents.

Supreme Court

*No. 86–0211. Argued May 28, 1987.—Decided June 26, 1987.*

(Also reported in 407 N.W.2d 908.)

For the petitioner-appellant-petitioner the cause was argued by *John Jorgensen,* assistant corporation counsel with whom on the briefs was *Robert G. Ott,* deputy corporation counsel.

For the respondents the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

DAY, J. This is a review of an unpublished decision of the court of appeals, District I, summarily affirming an order of the circuit court for Milwaukee county, Honorable Robert W. Landry, which affirmed an order of the Labor and Industry Review Commission (Commission), finding that the Petitioner, County of Milwaukee (County), discriminated against Respondent, Stephen M. Serebin (Serebin) on the basis of a conviction record, in violation of the Wisconsin Fair Employment Act (Act), secs. 111.31–111.37, Stats., 1979–1980.

The issue presented is: Could the Commission reasonably conclude that the circumstances of the offenses for which Serebin had previously been convicted were not "substantially related" to the circumstances of the job of crisis intervention specialist so that it was illegal discrimination under the Act to terminate Serebin on the basis of his conviction record? We conclude that the circumstances of the offenses for which Serebin had been convicted substantially related to the circumstances of his job with the County. We further conclude that the Commission improperly applied sec. 111.32(5)(h)2b, Stats., 1979–1980[1] and its interpretation of such statute had

---

[1]Section 111.32(5)(h)2b, Stats., outlines an exception to the general prohibition against employment discrimination on the basis of a conviction record. The general prohibition against discrimination is outlined in sec. 111.325. Section 111.32(5)(a), defines the various types of discrimination. Sections 111.32(5)(a) and 111.32(5)(h)2b, provide:

no rational basis. We reverse the decision of the court of appeals.

> "**111.32 Definitions.** When used in this subchapter: ... (5)(a) 'Discrimination' means discrimination because of age, race, color, handicap, sex, creed, national origin, ancestry, arrest record or conviction record, by an employer or licensing agency individually or in concert with others, against any employe or any applicant for employment or licensing, in regard to hire, tenure or term, condition or privilege of employment or licensing and by any labor organization against any member or applicant for membership, and also includes discrimination on any of said grounds in the fields of housing, recreation, education, health and social welfare as related to a condition or privilege of employment ...
>
> "(h) The term 'arrest record' includes, but is not limited to, information indicating that a person has been questioned, apprehended, taken into custody or detention, held for investigation, arrested, charged with, indicted or tried for any felony, misdemeanor or other offense pursuant to any law enforcement or military authority. The term 'conviction record' includes, but is not limited to, information indicating that a person has been convicted of any felony, misdemeanor or other offense, placed on probation, fined, imprisoned or paroled pursuant to any law enforcement or military authority. It is discrimination because of arrest record or conviction record: ...
>
> "2. For any employer, labor organization, licensing agency or employment agency to refuse to hire, employ, admit or license any person, or to bar or terminate any person from employment, membership or licensing, or to discriminate against any person in promotion, compensation, terms, conditions or privileges of employment, membership or licensing, or otherwise to discriminate against any person because such person has an arrest record or a conviction record, provided, however, that it shall not be unlawful: ...
>
> "b. For an employer or licensing agency to refuse to employ or license, or to bar or terminate from employment or licensing, any person who has been convicted of any felony, misdemeanor or other offense the circumstances of which substantially relate to the circumstances of the particular job or licensed activity."

The facts of this case are essentially undisputed. In November, 1979, Serebin was hired as a "crisis intervention specialist" under a program operated by the Medical College of Wisconsin, in conjunction with the Milwaukee County Mental Health Complex. Operation of the program was transferred to Milwaukee county in January, 1981; Serebin continued to work, receiving an "emergency" appointment as a county employee.

At the time he was hired, Serebin faced criminal charges arising out of his employment as administrator of a nursing home, the Glendale Convalescent Center, between December, 1975 and June, 1976. Serebin was charged with a felony (homicide by reckless conduct) related to a nursing home patient who wandered from the facility and died from exposure. Serebin was also charged with multiple misdemeanor charges related to patient neglect.

On November 14, 1981, Serebin was found guilty of the felony and twelve misdemeanors. The court of appeals reversed the convictions but this court subsequently reinstated the misdemeanor convictions. *State v. Serebin,* 114 Wis. 2d 314, 338 N.W.2d 855 (Ct. App. 1983), *aff'd. in part, rev'd. in part,* 119 Wis. 2d 837, 350 N.W.2d 65 (1984).

Two days following the judgment of conviction in the trial court, November 16, 1981, the acting administrator of the Milwaukee County Health Complex, Richard Scheller, met with associate administrator, James Boyle, and assistant administrator, Barry Horowitz, to discuss Serebin's conviction. Scheller elected to terminate Serebin's employment immediately.

On March 5, 1982, Serebin filed a complaint with the Equal Rights Division of the Department of Industry, Labor and Human Relations, alleging that

Milwaukee county discriminated against him because of his conviction record, in violation of the Act, secs. 111.31–111.37, Stats., when the County terminated his employment.

The Division Investigator issued an Initial Determination on January 11, 1983, concluding that there was no probable cause to believe that the County discriminated against Serebin "because of conviction record in regard to discharge in violation of secs. 111.31–111.37."

Serebin appealed from the Initial Determination and a hearing was held on February 6, 1984, before a department hearing examiner. The hearing examiner issued a decision, including findings of fact, conclusions of law, and an order, on March 13, 1984.

The hearing examiner concluded that the County had discriminated against Serebin "on the basis of conviction in regard to discharge," in violation of the Act. The examiner concluded, as a matter of law, that "[t]he circumstances of the offense which gave rise to [Serebin's] conviction were not substantially related to the circumstances of the job of crisis intervention specialist with the [County]."

The County petitioned for review of the examiner's decision to the Commission. The Commission issued its final decision on January 15, 1985, affirming the examiner's decision with some modification.[2]

One modification relevant to our review is the Commission's substitution of a new finding of fact. The examiner's finding of fact, number twelve, read:

---

[2]In addition to the modification set out above, the Commission also modified a portion of the hearing examiner's order related to Serebin's attorney's fees in pursuing his claim. This matter is not presently before the court.

811

"12. The Respondent discharged the Complainant because of his conviction and because of concerns over adverse publicity to the county connected with its employment of the Complainant in view of his conviction."

The Commission replaced the foregoing with the following new paragraph:

"12. The Respondent discharged the Complainant based upon the newspaper report of his conviction and because of concerns over adverse publicity to the County connected with its employment of the Complainant, in view of this reported conviction, without verifying the conviction or inquiring into surrounding circumstances."

Also included in the Commission's decision was a separate section entitled, "Memorandum Opinion," which discussed the reasons given by the County as to why the discharge was justified. The Commission stated that there was no showing that this case came within the statutory exception to the law prohibiting discrimination based on conviction record, noting:

"The offenses that Complainant was convicted of, failing as a nursing home administrator to provide for adequate staff and diet to patients at a nursing home, give absolutely no indication whatever that Complainant would have been unable to continue successfully providing direct crisis intervention assistance in a social work capacity to members of the public with acute mental health problems. Complainant's conviction indicated that he had failed to fulfill his obligations as an *administrator*, not as a direct care worker."

On February 7, 1985, the County commenced this proceeding for judicial review pursuant to ch. 227,

Stats., in Milwaukee county circuit court. The circuit court rendered a bench decision on December 16, 1985. The circuit court upheld the determination of the Commission, stating: "The Examiner and the board did not think that the circumstances of the conviction related to the circumstances of this employment and I would conclude that the standard they used was an appropriate one and their conclusions are justified in fact."

The circuit court issued an order on December 30, 1985, affirming the decision of the Commission in its entirety and restating its previous bench decision that "the Commission reasonably could conclude that the petitioner unlawfully discriminated against Serebin on the basis of his conviction record," and that "the Commission reasonably could conclude that the circumstances of Serebin's conviction were not substantially related to his duties as a crisis intervention specialist."

The court of appeals, by opinion and order dated October 14, 1986, summarily affirmed the order of the trial court, concluding that the "circumstances of Serebin's conviction were not substantially related to his employment duties with the country...." The County's petition for review was granted on January 20, 1987.

Under the Act it is unlawful to discriminate on the basis of a conviction record. *See,* secs. 111.32(5)(h), 111.325, Stats., 1979–1980. Section 111.32(5)(h)2b, outlines an exception to this general rule. The legislature has decided that it shall not be unlawful:

> "[F]or an employer of licensing agency to refuse to employ or license, or to bar or terminate from employment or licensing, any person who has

been convicted of any felony, misdemeanor or other offense *the circumstances of which substantially relate to the circumstances of the particular job or licensed activity.*" (Emphasis added.)

In this case we are concerned with the meaning of the highlighted language above.

This court has had occasion to interpret the statutory exception to the prohibition against conviction record discrimination in *Law Enforce. Stds. Bd. v. Lyndon Station,* 101 Wis. 2d 472, 305 N.W.2d 89 (1981) and *Gibson v. Transp. Comm.,* 106 Wis. 2d 22, 315 N.W.2d 346 (1983).

In *Lyndon Station,* this court dealt with the question of whether the Village of Lyndon Station had the authority to employ William G. Jessen, a convicted felon, as police chief after the Wisconsin Law Enforcement Standards Board (LESB) deemed Jessen ineligible for that appointment and refused to certify him as qualified. 101 Wis. 2d 475–476. Jessen had been convicted of twenty-six felony counts of misconduct in public office after having been found guilty of falsifying uniform traffic citations while serving as chief deputy sheriff for Juneau county. *Id.* at 476.

The village board, aware of Jessen's convictions, hired him as chief of police, believing that Jessen's convictions were not felonies, but misdemeanors. *Id.* at 477. Despite LESB's refusal to certify Jessen, the village board hired Jessen on a full time basis after he completed a probationary period. The LESB eventually petitioned the circuit court for an alternative writ of mandamus to compel the village to terminate Jessen's employment. *Id.* at 480.

The trial court granted the peremptory writ of mandamus directing that Jessen be removed. Issuance

of the writ was stayed pending appeal, and the court of appeals affirmed.

In analyzing whether Jessen was discriminated against on the basis of a conviction record, this court focused on the statutory exception outlined in sec. 111.32(5)(h)2b, Stats. It was noted that Jessen's felony conviction related to twenty-six felony counts of falsifying uniform traffic citations, and that as a police officer in the village, Jessen would have to enforce the traffic laws. *Id.* at 492. The court stated:

> "[U]nder the facts of this case, it can hardly be said that the circumstances of the offense for which Jessen was convicted fail to meet the substantial relationship exception to the prohibition against employment and licensing discrimination on the basis of a conviction record ... as common sense dictates that a conviction of the felony of misconduct in public office for falsifying traffic tickets certainly bears a substantial relationship to the duties of a police officer who is called upon to issue traffic citations." *Id.*

In *Gibson,* this court addressed the question of what type of investigation is required, under sec. 111.32(5)(h), Stats., 1977 before the Department of Transportation (Department) can refuse to grant a school bus driver's license to an individual convicted of armed robbery. 106 Wis. 2d at 23–24. Section 343.12(2)(e) precludes granting a school bus driver's license to anyone convicted of a felony within five years prior to their application for the license. Theodore Gibson had been convicted of armed robbery in Indiana in 1976. He applied for a bus driver position in Milwaukee in 1977 and his application was denied by the Department.

This court noted that, in refusing to grant Gibson a license, the Department "ascertained the elements of the crime" for which Gibson was convicted, and "determined that conviction of the crime of armed robbery under Indiana law constituted circumstances which substantially relate to the circumstances of school bus driving." *Id.* at 26. This court concluded that "there was a rational basis for the Department's interpretation that sec. 111.32(5)(h)2b, Stats., required that it go no further than determining the elements of the offense for which [Gibson] was convicted since conviction of that crime constituted circumstances substantially relating to school bus driving." *Id.* at 27.

The *Gibson* court observed that the armed robbery conviction required a finding that the person "participated in the taking of another's property by threatening to harm them with a dangerous weapon." *Id.* at 28. The *Gibson* court reasoned:

> "It thus indicates a disregard for both the personal and property rights of other persons. It also indicates a propensity to use force or the threat of force to accomplish one's purposes. The armed robbery conviction indicates personal qualities which are contradictory to the extreme patience, level-headedness and avoidance of the use of force [testified to as] essential in a school bus driver." *Id.*

Citing the dissent's argument in *Lyndon Station* that sec. 111.32(5)(h), Stats., requires an inquiry into the specific factual circumstances of the crime upon which the felony conviction was based (*Lyndon Station,* 107 Wis. 2d at 509–516), the *Gibson* court stated that "[t]his court declined to read such a requirement

into sec. 111.32(5)(h), in *Lyndon Station,* and we decline to do so here." *Gibson,* 106 Wis. 2d at 28.

The Commission suggests that this court has constructed a standard for determining whether discrimination on the basis of conviction record is acceptable which differs from the standard set forth in the statute. The Commission identifies the statutory standard as the "circumstances of the offense" standard. This court, it is intimated, has employed the "elements of the crime" standard in *Gibson* and, arguably, in *Lyndon Station.* The Commission argues: "The difficulty with the court's analysis in [*Lyndon Station*] and *Gibson* is that it fails to explain when the 'elements of the crime' standard should be used as opposed to the 'circumstances of the offense' standard."

The County argues that the hearing examiner was required to go no further than to determine the elements of Serebin's offenses, and conclude as a matter of law that "the requisite nexus between the offenses and Serebin's job was established" and therefore there was no unlawful discrimination.

The County asserts that this court, in *Lyndon Station* and *Gibson,* based the proper standard on a common sense approach. The County contends that, using a common sense approach, Serebin's offenses are substantially related to the job. Contrary to the finding of the hearing examiner, there is a substantial relationship. The County argues:

> "Conviction of *twelve counts* of patient neglect strongly suggests a pattern of behavior and an underlying attitude which resulted in Serebin's knowing failure to accept responsibility for the needs of an extremely dependent, vulnerable population. The patients whom Serebin would encoun-

ter as a crisis intervention worker either on the telephone or in the field would surely be similarly vulnerable and dependent. Serebin's inclination and ability to deal responsibly and professionally with their needs is, by any common sense analysis, substantially related to his criminal dereliction as a nursing home administrator."

The basic question is: What is the nature of the inquiry required by sec. 111.32(5)(h)2b? Answering this question requires that this court determine what the legislature intended when it chose to phrase the exception in terms of the "circumstances" of the offense and "circumstances" of the particular job. Depending on what meaning is ascribed to the term "circumstances," the question remains: What procedure is required in order that courts may assess the "circumstances" in the particular case?

■

The parties to this case assign different interpretations to the scope and meaning of the exception, and therefore an ambiguity arises. When the language of a statute is ambiguous, this court will interpret the statute in order to ascertain and give meaning to the intent of the legislature. *DeMars v. LaPour,* 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985).

This court has stated that, when a statute is ambiguous, "the legislature is presumed to have intended an interpretation that advances the purposes of the statute." *Belleville State Bank v. Steele,* 117 Wis. 2d 563, 570, 345 N.W.2d 405 (1984). Further, "an interpretation which fulfills the objectives of the statute is favored over an interpretation which defeats the objectives of the legislature." *Id.* In discerning legislative intent, this court will examine the "scope,

subject matter, and object of the statute." *DeMars*, 123 Wis. 2d at 370.

This court has stated that the Commission's interpretation of a statute will be affirmed if it is founded on a rational basis. *Dairy Equipment Co. v. ILHR Department*, 95 Wis. 2d 319, 327, 290 N.W.2d 330 (1979–1980). Moreover, sec. 227.20(10), Stats., 1979–1980 requires that "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency" which is involved.

Ascertaining the meaning and requirements of this statute must begin with an analysis of the underlying purpose of the statute. The prohibition against conviction record discrimination in the employment context is part of a broad-based effort to eradicate many sources of employment discrimination. The Fair Employment Act recognizes several categories, characteristics, and classifications of individuals which have traditionally been the basis for employment discrimination. The Act prohibits discriminating against individuals on the basis of age, race, creed, color, handicap, sex, national origin, ancestry, arrest record, and conviction record. *See*, sec. 111.31, Stats., 1979–1980.

It should be noted that sec. 111.32(5)(a), Stats., 1979–1980 in defining what categories may not be discriminated against, before it refers to "arrest record or conviction record," lists "age, race, color, handicap, sex, creed, national origin," and "ancestry." All of these latter categories except "creed" are involuntarily acquired and one has a "right" not to be discriminated against because of them. "Creed," which refers to religion, we regard as a very precious right of individual choice, to be fully protected by law. In contrast, being a criminal is a voluntary act—a

matter of choice. There is no "right" to be a criminal. On the contrary, one who engages in it is universally regarded as anti-social. It carries no "right" to engage in such activity. It alone of all the listed categories describes persons subject to fine and imprisonment upon conviction. The Wisconsin Constitution provides in Article I, sec. 2:

"There shall be neither slavery, nor involuntary servitude, in this state, *otherwise than for the punishment of crime, whereof the party shall have been duly convicted.*" (Emphasis added.)

Likewise, sec. 1, of the thirteenth amendment to the United States Constitution provides:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

So it was made clear by the legislature that in dealing with convicted criminals the fact of such criminality put them in a special category, different from the others listed. Actions taken by an employer or licensing agency which might normally constitute discrimination are, by definition, deemed not to be "unlawful" if it can be shown that the circumstances of the offense substantially relate to the circumstances of the particular job or licensing activity.

The legislature has not set forth its reasons for including the exception. However, we find the reasons for its inclusion to be readily apparent. The legislature could have chosen to not include a statutory exception. Absent the exception, an employer could not, for

example, refuse to hire a person because that person had a conviction record. This would be true in a case where the conviction had been on charges of sexual molestation of children and the individual applied for a job as a day care supervisor.

It is manifest that the legislature did not intend to work such a result. It would be simply unconscionable to require employers in the example above to be forced to hire such an individual or face charges of discrimination.

It is evident that the legislature sought to balance at least two interests. On the one hand, society has an interest in rehabilitating one who has been convicted of crime and protecting him or her from being discriminated against in the area of employment. Employment is an integral part of the rehabilitation process. On the other hand, society has an interest in protecting its citizens. There is a concern that individuals, and the community at large, not bear an unreasonable risk that a convicted person, being placed in an employment situation offering temptations or opportunities for criminal activity similar to those present in the crimes for which he had been previously convicted, will commit another similar crime. This concern is legitimate since it is necessarily based on the well-documented phenomenon of recidivism.[3]

---

[3]The legislature has explicitly recognized the recidivism tendencies of criminals in sec. 939.62, Stats., the "repeater" statute. This statute provides that repeater offenders may receive increased penalties for their crime.

A 1985 report published by the United States Department of Justice summarized a study on recidivism conducted by the Bureau of Justice Statistics. The report stated that for the study period in 1979, roughly sixty-one percent of those admitted to

prison were recidivists (i.e., they had previously served a sentence to incarceration as a juvenile, adult, or both). *See,* Bureau of Justice Statistics, U.S. Dept. of Justice, Special Report, *Examining Recidivism,* NCJ–96501 (1985). The report also revealed that recidivists were estimated to account for approximately two-thirds or more of the burglaries, auto thefts, and forgery/fraud/embezzlement offenses attributable to all the admissions.

There appears to be little debate over the presence of recidivism. As one author has noted, although estimates vary, "most authorities nevertheless agree that a substantial percentage of all convicted offenders later return to crime." *Citing,* P. Tappan, *Crime, Justice and Correction* 60 (1960) (noting that over fifty percent of all inmates released nationally in 1946 had previously been incarcerated) and Pelkin, Blumstein & Glass, *Recidivism as a Feedback Process: An Analytical Model and Empirical Validation,* 1 J. Crim. Just. 7 (1973) (estimating that eighty-seven percent of all arrested suspects have prior arrests), Note, *Selective Incapacitation: Reducing Crime Through Predictions of Recidivism,* 96 Harv. L. Rev. 511, n. 2 (1982). Also noted by the same author are the conclusions set out in Peterson, H. Braiker & S. Pozich, *Who Commits Crimes,* 186–188 (1981) revealing that the twenty-five percent most active offenders in the study sample accounted for fifty-eight percent of armed robberies, forty-six percent of assaults, forty-eight percent of drug sales, and sixty-five percent of burglaries committed by the group. 96 Harv. L. Rev. at 511, n. 6.

Recidivism is often undetected. One study focusing on rape and child molestation drew the following conclusions:

> "The findings suggests that contrary to the impression yielded by the general literature, such offenders are serious recidivists. It would appear from this study that sexual offenders avoid detection approximately twice as often as they are apprehended for their crimes. The rapists, who had an average of three rape convictions on record, and the child molesters, who averaged two convictions on record, admitted to an average of five similar offenses for which they were never apprehended. It can be reasonably assumed that this is at best a very *conservative* estimate of the actual undetected recidivism among these inmates." Groth, Longe & McFadin, *Undetected Recidivism in*

822

It is highly desirable to reintegrate convicted criminals into the work force, not only so they will not remain or become public charges but to turn them away from criminal activity and hopefully to rehabilitate them. This is a worthy goal and one that society has shown a willingness to assume, as evidenced by the large sums of money expended in various rehabilitative programs. However, the legislature has clearly chosen to not force such attempts at rehabilitation in employment settings where experience has demonstated the likelihood of repetitive criminal behavior.

■

This law should be liberally construed to effect its purpose of providing jobs for those who have been convicted of crime and at the same time not forcing employers to assume risks of repeat conduct by those whose conviction records show them to have the "propensity" to commit similar crimes long recognized by courts, legislatures and social experience.

■

In balancing the competing interests, and structuring the exception, the legislature has had to determine how to assess when the risk of recidivism becomes too great to ask the citizenry to bear. The test is when the circumstances, of the offense and the particular job, are substantially related.

■

We reject an interpretation of this test which would require, in all cases, a detailed inquiry into the

*Rapists and Child Molesters,* 28 Crime & Delinquency 450, 456 (1982).

On the general topic of sex offenders and recidivism, *see,* Romero & Williams, *Recidivism Among Convicted Sex Offenders: A 10-Year Followup Study,* 49 Federal Probation 589 (1985).

facts of the offense and the job. Assessing whether the tendencies and inclinations to behave a certain way in a particular context are likely to reappear later in a related context, based on the traits revealed, is the purpose of the test. What is important in this assessment is not the factual details related to such things as the hour of the day the offense was committed, the clothes worn during the crime, whether a knife or a gun was used, whether there was one victim or a dozen or whether the robber wanted money to buy drugs or to raise bail money for a friend. All of these could fit a broad interpretation of "circumstances." However, they are entirely irrelevant to the proper "circumstances" inquiry required under the statute. It is the circumstances which foster criminal activity that are important, e.g., the opportunity for criminal behavior, the reaction to responsibility, or the character traits of the person.[4]

---

[4]The Rules of Evidence do not allow the introduction of evidence of a person's character or a trait of his character in order to prove he acted in conformity therewith. *See,* sec. 904.04(1), Stats., 1979–1980. Moreover, the evidence rules specifically provide that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Section 904.04(2).

We note that the reason that other acts evidence is not admissible is not that the evidence is irrelevant to the issue of character. On the contrary, as stated by this court, the evidence is "'objectionable, not because it has no appreciable probative value, but because *it has too much.*'" *Whitty v. State,* 34 Wis. 2d 178, 292, 149 N.W.2d 557 (1967), *cert. den'd.* 390 U.S. 959 (1968), *quoting,* Wigmore, *Evidence* (3d ed.) 646, sec. 194 (emphasis added).

Prior crimes evidence is admissible for other purposes. For example, a witness' credibility may be impeached by introducing evidence of a prior criminal conviction. *See,* sec. 906.09(1), Stats., 1979–1980. Prior crimes evidence is not only relevant in the

The full assessment of what may be termed the "fostering" circumstances may, at times, require some factual exposition. For instance, in "disorderly conduct" cases the type of offensive circumstances is not as explicit as it is in sexual assault, armed robbery, theft or embezzlement convictions for example. However, such factual inquiry would have as its purpose ascertaining relevant, general, character-related circumstances of the offense or job.

Under the terms of sec. 111.32(5)(h)2a, Stats., 1979–1980, the legislature has set out another exception to the prohibition against arrest record and conviction record discrimination. Under this section, it is not unlawful:

> "a. For an employer or licensing agency to refuse to employ or license, or to suspend from employment or licensing, any person who is subject to a pending criminal charge *if the circumstances of the charges substantially relate to the circumstances of the particular job or licensed activity.*" (Emphasis added.)

We find it significant that the above quoted exception is phrased in terms similar to the exception at issue in this case. An employer faced with an applicant who has a pending criminal charge against him has little to base a "circumstances" inquiry on other than what is contained in a complaint or information. Thus, the employer's inquiry is limited to general facts. It is not unreasonable to assume that the legislature, in choosing the same test for both exceptions 2a and 2b,

___

context of an inquiry under sec. 111.32(5)(h)2b, but the legislature has required that it be analyzed. Analyzing prior crimes evidence with respect to its relevancy to character is clearly not prohibited.

contemplated a similarity limited inquiry under the 2b exception. This court's definition of the proper "circumstances" inquiry may be employed in situations arising under either 2a or 2b.

We note that "circumstance" may mean more than simply "fact." *Webster's Ninth New Collegiate Dictionary,* p. 242 (1983) provides:

> "CIRCUMSTANCE .... 1 a: A condition, fact, or event accompanying, conditioning, or determining another: an essential or inevitable concomitant...."

Thus, for example, an "essential concomitant" in an armed robbery case is the propensity of the robber to use force or the threat of force to accomplish one's purposes along with thievery. This is precisely the type of "circumstance" the *Gibson* court highlighted when it employed the so-called "elements only" test. *Gibson,* 106 Wis. 2d at 28. It appears that the "elements only" test is not a test distinct from the statutory test. Rather, focusing on the elements simply helped to elucidate the circumstances of the offense.

In determining the proper scope of the test, it must be kept in mind that the test must serve not only the judicial system's purposes but the employer's or licensing agency's purposes as well. What test the courts must employ will determine what employers and licensing agencies will do when making employment decisions. Therefore, there must be a semblance of practicality about what the test requires. A full-blown factual hearing is not only unnecessary, it is impractical. Employers and licensing agencies should be able to proceed in their employment decision in a confident, timely and informed way. The inquiry

envisioned under the statute would enable the employers and agencies to do this.[5]

The Commission, in applying this test under the statutory exception, focused on whether the offenses for which Serebin was convicted gave any "indication" that Serebin would have been unable to "continue successfully providing direct crisis intervention assistance." The Commission emphasized that Serebin had "consistently received good to excellent job evaluations" as an intervention specialist.

Whether an individual can perform a job up to the employer's standards is not the relevant question. This does not constitute a proper inquiry into the "circumstances." The Commission also emphasizes that the offenses related to Serebin's failures as an *administrator,* and not as direct care worker and that the job in question involved direct care. We do not find

---

[5]The scope of the Act is very broad and covers the full spectrum of employers. The current definition of "employer" for purposes of the Act is set out in sec. 111.32(6)(a), Stats., 1985–1986, which provides in part:

> "**111.32 Definitions.** When used in this subchapter: ... (6)(a) 'Employer' means the state and each agency of the state and, except as provided in par. (b), any other person engaging in any activity, enterprise or business employing at least one individual."

The foregoing definition clarified the scope of the term employer and was introduced by ch. 334, sec. 4, Laws of 1981.

For information concerning the evolving scope of the coverage of the Act, *see,* Comment, *Labor Law—Union Membership Denied on the Basis of Racial Discrimination,* 1958 Wis. L. Rev. 294, 303; Comment, *Wisconsin's Fair Employment Act: Coverage, Procedures, Substance, Remedies,* 1975 Wis. L. Rev. 696, 699–702.

this distinction to be persuasive.[6] The responsibilities present in both jobs extended to a group of people similarly situated so that neglect or dereliction of duties in either job would likely have similar consequences.

The County argues that the "circumstances" of the offense and the job are similar since in both contexts Serebin was in a position of exercising enormous responsibility for the safety, health, and life of a vulnerable, dependent segment of the population. The twelve misdemeanors indicate a pattern of neglect of duty for the welfare of people unable to protect themselves. The propensities and personal qualities exhibited are manifestly inconsistent with the expectations of responsibility associated with the job. We agree with the County's analysis.

■

We conclude, as a matter of law, that the circumstances of the offenses for which Serebin was convicted substantially relate to the circumstances of the job of crisis intervention specialist with the County. The Commission could have looked to the findings of fact made by the hearing examiner, which provided, in part:

> "1. As an administrator at Glendale Convalescent Center, Serebin 'handled the overall business end of the home.'

> "2. Serebin was charged with 58 counts of neglect of nursing home residents; he was convicted of 12 counts. He was also charged and convicted of 1 felony count of homicide by reckless conduct

---

[6]This is a new twist to the war crime defense of "I'm not guilty because I was only following orders." This new approach seems to be, "I am not guilty because I only gave the orders!"

related to the death of a patient who had wandered from this home and died from exposure to cold.'

"3. The trial court found that while Serebin had been administrator 'a number of patients had suffered from bed sores and weight losses which were found to have been caused by [Serebin's] failure ... to provide sufficient staff and adequate diet, and that one patient had wandered out of the nursing home and died of exposure to cold, as a result of [Serebin's] failure ... to provide sufficient staff.'

"4. Serebin's job as a crisis intervention specialist 'involved his receiving telephone calls on a publicized "hot line" number from members of the public with acute mental health related problems ... [he] would talk to the caller ... and would then either counsel the caller over the phone, refer them to appropriate counseling or service agencies, or send out the ... mobile crisis team.' Following his promotion to Crisis Intervention Specialist II, Serebin 'did occasionally go out "into the field" to deal directly with persons seeking help, but his primary work involved taking crisis calls over the phone.' In addition, Serebin 'sometimes had occasion ... to deal with county-wide law enforcement agencies and with assistant district attorneys regarding persons seeking crisis intervention services.'"

On the basis of the foregoing the Commission should have concluded that the County was justified in discharging Serebin.

Although it is a well-accepted proposition that courts should not substitute their judgment for an agency's application of a particular statute to found facts in fields in which an agency has particular

competence or expertise, as long as there is a rational basis for that interpretation, this rule has exception when the application conflicts with prior decisions of this Court. *Pabst v. Department of Taxation*, 19 Wis. 2d 313, 323–324, 120 N.W.2d 77 (1963). The Commission's application of sec. 111.32(5)(h)2b, Stats., in this case conflicts with the interpretation, application, and spirit of both *Lyndon Station* and *Gibson*. These cases have suggested that the inquiry does not turn on superficial matters, such as the distinctions between an administrative job and a "direct care" job. These cases make clear that what is important here is that what has been demonstrated is that Serebin was apparently unwilling to accept his legal and professional responsibility for an extremely vulnerable population. The responsibilities of both jobs are such that the "circumstances" of the offenses and the job are "substantially related" for purposes of sec. 111.32(5)(h)2b.

Section 227.20(5), (1979–1980) Stats., provides:

> "**227.20 Scope of review** .... (5) The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law."

Since we conclude that, under a correct interpretation and application of sec. 111.32(5)(h)2b, the County fell within the statutory exception to the prohibition against conviction record discrimination, we remand this case to the Commission with direction to dismiss Serebin's complaint on the merits.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the Labor and Industry Review Commission for further proceedings consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). Both parties in this case agree that this court's interpretation in prior cases of the statutory phrase "circumstances of the offense" was not true to the text of the statute and raised problems in application. The majority now describes "the circumstances of the offense" in a variety of ways: as the elements of the offense, as the character-related facts surrounding the offense, as the deeper causes of criminal behavior ("fostering circumstances" such as "the opportunity for criminal behavior, the reaction to responsibility, or the character traits of the person") and as the essential concomitants of the offense (*e.g.,* the propensity of anyone who commits armed robbery to use force or the threat of force to achieve goals or objectives).

One purpose of the Fair Employment Act (Act) is to prohibit an employer from prejudging an applicant's or employee's suitability for a job on the basis of a conviction record. Contrary to the assertions of the majority, the Act does place a burden on an employer to consider each applicant or employee to ascertain whether the circumstances of the offense are substantially related to the circumstances of the job.

I fear that what may emerge from the majority opinion is an emphasis on describing the circumstances of the offense at a high level of generality. At the highest level of generality, according to the majority opinion, an individual convicted of a crime is an "anti-social" "recidivist," and anti-social recidivists

are fit for few employment positions. Clearly the majority cannot have intended this kind of approach, because such an approach tends to eviscerate the statute. The legislature could not have intended to adopt an eviscerated statute.