# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1671 |

| | |
|---|---|
| COMPLETE TITLE: | Cree, Inc.,<br>        Petitioner-Respondent-Petitioner,<br>    v.<br>Labor and Industry Review Commission,<br>        Respondent-Co-Appellant,<br>Derrick Palmer,<br>        Respondent-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 395 Wis. 2d 642,953 N.W.2d 883
PDC No:2021 WI App 4 - Published

| | |
|---|---|
| OPINION FILED: | March 10, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 15, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Racine |
|   JUDGE: | Michael J. Piontek |

| | |
|---|---|
| JUSTICES: | |

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined. DALLET, J., filed a dissenting opinion in which ANN WALSH BRADLEY and HAGEDORN, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-respondent-petitioner, there were briefs filed by *Lindsey W. Davis, Robert H. Duffy,* and *Quarles & Brady LLP*, Milwaukee. There was an oral argument by *Robert H. Duffy*.

For the respondent-co-appellant, there was a brief filed by *Steven C. Kilpatrick* and *Anthony D. Russomanno*, assistant attorneys general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Anthony D. Russomanno*.

For the respondent-appellant there was a brief filed by *Alan C. Olson* and *Alan C. Olson & Associates, S.C.,* New Berlin. There was oral argument by *Alan C. Olson*.

An amicus curiae brief was filed on behalf of Legal Action of Wisconsin, Inc. by *Jessie Long, Sheila Sullivan, Susan Lund,* and *Megan Sprecher*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers and Commerce by *Corydon J. Fish*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP1671
 (L.C. No. 2019CV703)

STATE OF WISCONSIN         :      IN SUPREME COURT

**Cree, Inc.,**

     **Petitioner-Respondent-Petitioner,**

  **v.**

**Labor and Industry Review Commission,**

     **Respondent-Co-Appellant,**

**Derrick Palmer,**

     **Respondent-Appellant.**

**FILED**

**MAR 10, 2022**

Sheila T. Reiff
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined. DALLET, J., filed a dissenting opinion in which ANN WALSH BRADLEY and HAGEDORN, JJ., joined.

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 JILL J. KAROFSKY, J. We address whether Cree, Inc. (Cree) rescinding its job offer to Derrick Palmer based on his conviction record constituted unlawful employment discrimination or instead was lawful because the circumstances of Palmer's convictions "substantially relate" to the circumstances of the

job, per Wis. Stat. § 111.335(3)(a)1.[1]   We hold that Cree sufficiently established that the circumstances surrounding Palmer's 2013 convictions for domestic violence substantially relate to the circumstances of the offered position as an Applications Specialist.   Accordingly, Cree did not unlawfully discriminate against Palmer by rescinding its job offer.

## I.   BACKGROUND

### A.   Palmer's Convictions

¶2   In 2013, Palmer was convicted for committing eight crimes of domestic violence against his live-in girlfriend, L.R. According to the criminal complaint, the incident began on the morning of October 24, 2012, when Palmer and L.R. were arguing amidst a break-up and Palmer initially refused to leave their residence.   When Palmer eventually left for work, he called L.R. multiple times but she did not answer.   Approximately 30 minutes after leaving, Palmer returned to the residence and began yelling at L.R.   She tried to get away from Palmer by going into the bedroom but Palmer followed her.   Palmer then broke L.R.'s cellphone by throwing it against a window.   L.R. tried to escape from the room but Palmer pushed her onto the bed with such force that she bounced off and hit her head on the floor.   When L.R. started screaming in hopes that someone would hear her and call the police, Palmer grabbed her mouth and squeezed it "real hard."

---

[1] While this case was being litigated, Wis. Stat. § 111.335(1)(c)1. (2015-16) was renumbered to Wis. Stat. § 111.335(3)(a)1. (2017-18).   In this and all subsequent references to the Wisconsin Statutes we will refer to the 2017-18 version unless otherwise indicated.

Then Palmer allowed L.R. to get up, but as she tried to reach the door handle to escape, Palmer threw her on the bed, straddled her, and placed his hand over her mouth and nose, stopping her from breathing for about 30 seconds. Then Palmer started to cry, told L.R. that he loved her, and let her up from the bed. L.R. went into the bathroom to get ready for work and Palmer followed her and put his hand down the front of her pants. L.R. told Palmer to stop, but Palmer pulled L.R. to the bed and sexually assaulted her by engaging in sexual intercourse without her consent. Palmer again left the residence and L.R. contacted the police. L.R. additionally reported that Palmer had engaged in other acts of violence, including forced sexual intercourse, during their four-month relationship.

¶3 As a result of the incident, Palmer pleaded no contest to two counts of felony strangulation and suffocation, four counts of misdemeanor battery, one count of fourth degree sexual assault, and one count of criminal damage to property.[2] The circuit court also dismissed and read in two counts of false imprisonment and one count of threats to injure or accuse of a crime.[3] The circuit court sentenced Palmer to 30 months in prison, 30 months of extended supervision, four years of probation, and ordered him to

---

[2] Wis. Stat. § 940.235(1) (2011-12), Wis. Stat. § 940.19(1) (2011-12), Wis. Stat. § 940.225(3m) (2011-12), and Wis. Stat. § 943.01(1) (2011-12), respectively.

[3] A "read-in" crime is one that either is not charged or is dismissed as part of a plea agreement that the defendant agrees the circuit court may consider at sentencing, along with the underlying conduct. See Wis. Stat. § 973.20(1g)(b).

3

register as a sex offender. Palmer also has a 2001 battery conviction related to domestic violence.[4]

### B. Palmer's Job Opportunity with Cree

¶4 While incarcerated, Palmer earned his mechanical design certification through the Wisconsin Department of Corrections education program. He earned high marks and took advantage of opportunities to work as a tutor after he graduated from the program. With these new qualifications, in June of 2015 Palmer applied to work at Cree's Racine, Wisconsin facility as an Applications Specialist. At that time, Cree manufactured and marketed lighting components.[5] It employed approximately 1,100 people at its Racine facility. The facility itself spanned 600,000 square feet, including manufacturing space, storage areas, offices, cubical farms, break rooms, and the like. Although security cameras monitored some portions of the facility, there were also many "nooks and crannies" throughout that experienced little foot traffic, no security camera coverage, and noise loud enough to drown out a person's voice.

¶5 As for the particular job, the Applications Specialist's primary responsibilities included designing and recommending

---

[4] Although this charge was not known to Cree when it rescinded its employment offer, the record before the Labor and Industry Review Commission (LIRC) indicates that Palmer admitted to this conviction. The parties do not dispute that the court may consider the 2001 conviction as part of Palmer's conviction record, and thus we assume without deciding that it is proper to consider it.

[5] In May of 2019, Cree sold its lighting business to Ideal Industries, Inc.

lighting systems to customers, sometimes on location at customers' facilities. Cree expected the Applications Specialist to operate largely independently and without close supervision. It also expected occasional travel to trade shows, which would require unsupervised overnight hotel stays. Applications Specialists had access to most of Cree's Racine facility.

¶6 In July 2015 Cree offered Palmer the Applications Specialist job subject to a standard background check. The background check revealed Palmer's 2013 convictions.[6] Cree referred the matter to its general counsel who reviewed Palmer's conviction record using a matrix that categorized each of Palmer's convictions as a "fail." Cree then rescinded its offer of employment to Palmer.

## C. Palmer's Discrimination Complaint

¶7 Palmer filed a complaint with the Wisconsin Department of Workforce Development's Equal Rights Division (ERD) alleging that Cree discriminated against him on the basis of his conviction record in violation of the Wisconsin Fair Employment Act.[7] The ERD found probable cause to hold a hearing on the merits before an

---

[6] Palmer was forthcoming to Cree about the existence of a conviction record prior to the background check. He responded "yes" to questions on an employment questionnaire asking whether he had been convicted of a felony or misdemeanor and stated the convictions were domestic-related. Palmer also disclosed his 2013 convictions when told there would be a background check.

[7] Wisconsin Stat. § 111.321 prohibits all employers from engaging "in any act of employment discrimination . . . against any individual on the basis of," among other things, a person's "conviction record," subject to a few exceptions.

administrative law judge (ALJ). The ALJ heard testimony from Palmer, Melissa Garrett (Cree's general counsel), and Lee Motley (a recruiter at Cree).

¶8 The ALJ also considered the testimony of Dr. Darald Hanusa, Cree's expert on domestic violence and domestic violence perpetrators. Dr. Hanusa testified as to the relationship between domestic violence, generalized violence and workplace violence, noting that there is "a direct relationship" between "a willingness to use violence in your intimate relationship" and "your willingness to use violence in other settings." Additionally, Dr. Hanusa spoke about the "power principle"——the concept that people who struggle with power and control issues tend to overuse their power when they do not get what they want. He testified that "the underpinning, underlying issues for men who are violent is their struggle with power and control. And it doesn't just end when they leave their house, it enters the workplace as well." Dr. Hanusa noted that "the best predictor of future violence is what's happened historically." He also emphasized that a charge of strangulation/suffocation is especially concerning given that in "the research on femicide, that is the homicide of women, suffocation ranks up as very high on every indice . . . for homicide." Based on all the testimony, the ALJ determined that Palmer's convictions did substantially relate to the Applications

Specialist position and thus, under Wis. Stat. § 111.335(3)(a)1.,[8] Cree did not discriminate against Palmer when it rescinded its job offer. Palmer appealed the ALJ's findings to the Labor and Industry Review Commission (LIRC).

¶9 LIRC reversed. LIRC reviewed the ALJ hearing record and conferred with the ALJ regarding his impressions of the testifying witnesses, but the ALJ did not impart any specific impressions regarding demeanor. Palmer v. Cree, Inc., ERD Case No. CR201502651, at 19 (LIRC, Dec. 3, 2018). Regardless, LIRC deemed Dr. Hanusa's testimony on the connection between domestic violence and workplace violence "unhelpful" and proffered its own, opposite conclusion regarding crimes of domestic violence: "where assault or battery convictions stem from personal relationships and the crimes are committed at home, it cannot necessarily be assumed that the individual is likely to engage in the same conduct with co-workers or customers at the work place." Id. at 13 & n.6. Based on that view of the domestic crimes at issue, LIRC concluded that they did not substantially relate to the Applications Specialist job because of:

- The "high degree of speculation and conjecture" necessary to envision a scenario in which Palmer would become

---

[8] Wisconsin Stat. § 111.335(3)(a)1. makes it "not employment discrimination because of conviction record to refuse to employ . . . any individual if," among other reasons, "the individual has been convicted of any felony, misdemeanor, or other offense the circumstances of which substantially relate to the circumstances of the particular job."

7

involved in a personal relationship with a female employee "that might end badly";

- The fact that the ability to meet female employees and form personal relationships with them is not unique to the job at issue;

- The lack of evidence that Palmer would have "significant personal interactions" with female employees;

- The lack of evidence that Palmer would have the opportunity to develop personal relationships with clients; and

- The lack of evidence to suggest that Palmer would act violently with coworkers or members of the public.

Id. at 11-13. With this view of the record, LIRC determined that the finding of a substantial relationship "would require a conclusion that unsupervised contact with other people is in and of itself a circumstance that might lead the complainant to engage in violent conduct." Id. at 13. And such a conclusion, LIRC continued, would run contrary to its prior decisions rejecting the proposition that "the mere presence of other human beings is a circumstance that creates a substantial relationship." Id.

¶10 The circuit court reversed LIRC's decision,[9] concluding that it was not supported by substantial evidence. The circuit court relied on Dr. Hanusa's uncontroverted expert testimony in deciding that a substantial relationship existed between Palmer's convictions and Cree's Applications Specialist position.

---

[9] The Honorable Michael J. Piontek of the Racine County Circuit Court presided.

¶11 The court of appeals then reversed again, upholding LIRC's decision that Cree failed to meet its burden to show a substantial relationship between Palmer's convictions and the job at hand. Cree, Inc. v. LIRC, 2021 WI App 4, 395 Wis. 2d 642, 953 N.W.2d 883. The court of appeals felt constrained by LIRC's disregard for Dr. Hanusa's testimony. Id. ¶7 n.4 ("[T]he weight and credibility of the evidence are for the agency, not the reviewing court, to determine." (quoting Milwaukee Symphony Orchestra, Inc. v. DOR, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674) (alteration in original))). Like LIRC, the court of appeals relied heavily on the domestic nature of Palmer's convictions, saying his "tendenc[y] and inclination[]" was "to be physically abusive toward women in a live-in boyfriend/girlfriend relationship." Id., ¶14 (alterations in original). Although the court of appeals surmised that Palmer was likely to recidivate against a future girlfriend, it concluded that such likelihood does not substantially relate to the job Cree offered him. Id.

¶12 We granted Cree's petition for review and again reverse.

## II. STANDARD OF REVIEW

¶13 In an employment discrimination appeal, we review LIRC's decision rather than the decision of the circuit court or the court of appeals while benefiting from their analyses. Wis. Bell, Inc. v. LIRC, 2018 WI 76, ¶28, 382 Wis. 2d 624, 914 N.W.2d 1. This case requires us to interpret Wis. Stat. § 111.335(3)(a)1. and determine if the facts of the case fulfill the legal standard set out in the statute. Statutory interpretation is a matter of law which we review de novo, giving no deference to the agency's legal

9

conclusions.  Tetra Tech EC., Inc. v. DOR, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21.  Whether the facts of a case fulfill a legal standard is also a matter of law we review de novo.  Id. In reviewing LIRC's decision, the court "shall not substitute its judgment for that of the agency" when reviewing factual determinations, but shall "set aside agency action . . . if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."  Wis. Stat. § 227.57(6).

### III.  ANALYSIS

¶14  Wisconsin's laws regarding employment discrimination based on conviction record serve two important, and sometimes competing, interests——rehabilitating those convicted of crimes and protecting the public from the risk of criminal recidivism.  See Milwaukee County v. LIRC, 139 Wis. 2d 805, 821-23, 407 N.W.2d 908 (1987).  As such, Wisconsin law generally prohibits an employer from discriminating against prospective employees on the basis of their conviction record.  Wis. Stat. §§ 111.321 & 111.322.  But "it is not employment discrimination because of conviction record . . . [if] the individual has been convicted of any felony, misdemeanor, or other offense the circumstances of which substantially relate to the circumstances of the particular job." Wis. Stat. § 111.335(3)(a)1.  This is known as the "substantial relationship test."  As an exception to the general rule against discrimination, the employer bears the burden of showing that the circumstances of the convicted offense substantially relate to the circumstances of the job.

A.   The Substantial Relationship Test

¶15  We first delineate the substantial relationship test by interpreting the plain language of Wis. Stat. § 111.335(3)(a)1. We then draw guidance from this court's three previous cases interpreting the substantial relationship test.  Finally, we clarify how convictions for crimes of domestic violence fit into the test.

1.  Plain language interpretation

¶16  In interpreting Wis. Stat. § 111.335(3)(a)1., we look to the statute's plain language and give that language its "common, ordinary, and accepted meaning." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. Courts often consult dictionaries to help determine the "common, ordinary, and accepted meaning" of statutory language. Stroede v. Soc'y Ins., 2021 WI 43, ¶12, 397 Wis. 2d 17, 959 N.W.2d 305.  The operative language in the substantial relationship test includes "circumstance" and "substantially relate."  Black's Law Dictionary defines "circumstance" as "[a]n accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event." Circumstance, Black's Law Dictionary 306 (11th ed. 2019); see also Circumstance, The American Heritage Dictionary of the English Language 347 (3d ed. 1992) ("a condition or fact attending an event and having some bearing on it; a determining or modifying factor.").  Accordingly, the definition of "circumstance" is quite broad and asks the court to consider the facts, events, and conditions that accompany both the convicted offense and the particular job.

11

¶17 The statute requires that these circumstances must "substantially relate" to each other. "Substantial" is defined in Black's Law Dictionary as "important, essential, and material; of real worth and importance." Substantial, Black's Law Dictionary 1728 (11th ed. 2019). We take this to mean that the circumstances must materially relate to each other, not merely superficially relate. We do not take "substantially relate" to mean that the circumstances must be nearly identical to satisfy the test. Indeed, elsewhere in the law "substantially" is used and interpreted to denote a middle ground——a heightened but not extreme standard.[10] Therefore, the plain language of the substantial relationship test requires that the employer show that the facts, events, and conditions surrounding the convicted offense materially relate to the facts, events, and conditions surrounding the job.

## 2. Previous cases

¶18 This framework has been further refined by three of our previous cases: Law Enforcement Standards Board v. Village of Lyndon Station, 101 Wis. 2d 472, 305 N.W.2d 89 (1981); Gibson v. Transportation Commission, 106 Wis. 2d 22, 315 N.W.2d 346 (1982); and Milwaukee County v. LIRC, 139 Wis. 2d 805. Lyndon Station

---

[10] See, e.g., State v. Curiel, 227 Wis. 2d 389, 406, 597 N.W.2d 697 (1999) (holding that "substantially probable" means "much more likely than not" rather than "extreme likelihood"); AllEnergy Corp. v. Trempealeau Cnty. Env't & Land Use Comm., 2017 WI 52, ¶76, 375 Wis. 2d 329, 895 N.W.2d 368 (reiterating that "substantial evidence" is more than "a mere scintilla" of evidence but does not amount to preponderance of the evidence).

concerned whether the Wisconsin Law Enforcement Standards Board (LESB) unlawfully discriminated when it deemed a prospective police chief ineligible for that appointment because he had been convicted of 26 counts of misconduct in public office for falsifying uniform traffic citations while working as a chief deputy sheriff.  101 Wis. 2d at 475-77.  We held that "common sense" dictated that the LESB recognize a substantial relationship between the convicted offenses and the job of police chief.  Id. at 492.  We pointed to the importance of "[p]ublic trust in the integrity of our law enforcement officials" and reasoned that someone who had been convicted of 26 felonies would have his "effectiveness" as a law enforcement officer "greatly diminished." Id. at 492-93.

¶19  Gibson concerned whether the Wisconsin Department of Transportation (DOT) made a properly detailed inquiry into Gibson's conviction record when it refused to grant him a school bus driver's license.  106 Wis. 2d at 23-24.  The DOT refused to license Gibson after considering only the elements of armed robbery——the crime for which Gibson was convicted——and not the surrounding circumstances, such as the fact that Gibson's coconspirator was the one who was armed.  Id.  We held that the DOT had a rational basis for limiting its inquiry to the elements of the convicted offense as that information alone sufficiently established a substantial relationship to the school bus driver

13

job.[11] Id. at 27. We elaborated that the elements of armed robbery indicated a "disregard for both the personal and property rights of other persons . . . [and] a propensity to use force or the threat of force to accomplish one's purposes." Id. at 28. We considered these traits to be contradictory to the traits required to be a bus driver, namely patience and level-headedness. Id. We cautioned that "this case does not mean that the particular factual circumstances of the crime upon which a felony conviction was based may never be relevant" in a substantial relationship evaluation because such a holding would impermissibly render the "circumstances of which" language "superfluous." Id.

¶20 Milwaukee County contains the most recent and thorough discussion of the substantial relationship test. 139 Wis. 2d 805. That case concerned whether an individual's convictions for misdemeanor patient neglect arising from his employment as a nursing home administrator substantially related to being a crisis intervention specialist. Id. at 809. In defining the scope of the substantial relationship inquiry, we looked to the term "circumstances." Id. at 818. To determine which circumstances were relevant, we focused on the underlying statutory purpose, highlighting the balance between the two sometimes competing

---

[11] This case, along with the other two cases concerning the substantial relationship test, was decided before Tetra Tech EC., Inc. v. DOR, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21, abrogated judicial deference to administrative agency interpretations of law. Under the old standard, we upheld an agency's decision if there was a rational basis for the agency to come to its conclusions. See Dairy Equip. Co. v. DILHR, 95 Wis. 2d 319, 327, 290 N.W.2d 330 (1980).

14

rehabilitation and public-protection interests. Id. at 821-23. We determined that although it is "highly desirable to reintegrate convicted criminals into the workforce . . . the legislature has clearly chosen to not force such attempts at rehabilitation in employment settings where experience has demonstrated the likelihood of repetitive criminal behavior." Id. at 823. It declared that the purpose of the substantial relationship test is to "[a]ssess[] whether the tendencies and inclinations to behave a certain way in a particular context are likely to reappear later in a related context, based on the traits revealed." Id. at 824.

¶21 Based on that understanding of the test, we interpreted "circumstances" to mean those circumstances material to "foster[ing] criminal activity," for example, "the opportunity for criminal behavior, the reaction to responsibility, or the character traits of the person." Id. But immaterial details such as "the hour of the day the offense was committed, the clothes worn during the crime, whether a knife or gun was used, whether there was one victim or a dozen[,] or whether the robber wanted money to buy drugs or to raise bail money for a friend" fall beyond the scope of relevant circumstances. Id. We emphasized that this line resulted in a practical test which employers can reliably apply without a full-blown factual hearing. Id. at 826. Finally, we addressed the Gibson court's supposed "elements only" test——that the statutory test requires only a review of the elements of the crime——by saying that "[i]t appears that the 'elements only' test is not a test distinct from the statutory test. Rather,

15

focusing on the elements simply helped to elucidate the circumstances of the offense." Id.

¶22  Applying our refined view of "circumstances," we held that the circumstances of the convicted offenses did substantially relate to the circumstances of the crisis intervention specialist job. Id. at 828. We rejected a "superficial" distinction between the fact that the offenses were committed in an administrative capacity while the job at hand involved direct care, instead focusing on the fact that the prospective employee would again be responsible for the wellbeing of vulnerable individuals. Id. at 830.

### 3.  Convictions for crimes of domestic violence

¶23  The seesawing appellate history in this case reveals the need for clarifying how employers, LIRC, and reviewing courts are to apply the substantial relationship test to domestic violence convictions.  Here LIRC, following a pattern of prior administrative cases, determined that acts of domestic violence are practically immaterial to recidivism in the workplace because of their domestic nature.  LIRC's assumption appears to be based on a common, but unsupported, belief that domestic batterers have

a tendency to be violent only towards intimate partners.[12]   LIRC reasoned that domestic abusers recidivate in the workplace only when engaging in "significant personal interactions" with female employees or clients.  Palmer, No. 201502651, at 12.  And when that particular scenario takes a "high degree of speculation and conjecture" to envision, the risk for recidivism remains low.  Id. at 11.  Said differently, LIRC's analysis hinged on a domestic batter's chances of finding a new domestic partner at work to then victimize at home.  That analysis differs from how LIRC analyzes non-domestic crimes of violence, thus yielding inconsistent results:  a substantial relationship may exist when a violent offense is committed outside the home but is barred when the same violent offense is committed against an intimate partner behind closed doors.

¶24  In short, LIRC has created an exception for domestic violence crimes.  And this exception disregards other circumstances material to fostering criminal activity when crimes of domestic violence are at issue.  True, both the domestic setting of the offense and the intimate relationship with the victim are

---

[12] LIRC cited its prior decisions for the idea that when dealing with domestic assault or battery convictions "it cannot necessarily be assumed that the individual is likely to engage in the same conduct with co-workers or customers at the work place." Palmer v. Cree, Inc., ERD Case No. CR201502651, at 13 (LIRC, Dec. 3, 2018) (citing Murphy v. Autozone, ERD Case No. 200003059 (LIRC, May 7, 2004)); see also Robertson v. Family Dollar Stores, Inc., ERD Case No. CR200300021 (LIRC, Oct. 14, 2005); Knight v. Wal-Mart Stores East LP, ERD Case No. CR200600021 (LIRC, Oct. 11, 2012); and Johnson v. Rohr Kenosha Motors, ERD Case No. CR201602571 (LIRC, Apr. 29, 2020).

"circumstances" that are not identical to the setting and relationships Palmer would encounter at Cree. Yet the substantial relationship test does not require an exact identity between these circumstances. For example, the armed robbery conviction in Gibson was deemed to substantially relate to employment as a school bus driver despite the robbery not being committed in an employment setting nor involving children as the victims. 106 Wis. 2d 22. As we later explained in Milwaukee County, that result was correct because the relevant circumstances of the offense are those material to the likelihood of recidivism in the workplace, such as "the opportunity for criminal behavior, the reaction to responsibility, or the character traits of the person." 139 Wis. 2d at 824. Thus, similar to the armed robbery conviction in Gibson and the several counts of patient neglect in Milwaukee County, crimes of domestic violence are to be assessed to determine "whether the tendencies and inclinations to behave a certain way in a particular context are likely to reappear later in a related context." Id.

¶25 To summarize, we apply the substantial relationship test to a domestic violence conviction the same way we would to any other conviction. According to our precedent, which no party asks

use to revisit,[13] we must look beyond any immaterial identity between circumstances——such as the domestic context of the offense or an intimate relationship with the victim——and instead examine the circumstances material to fostering criminal activity. The material circumstances are those that exist in the workplace that present opportunities for recidivism given the character traits revealed by the circumstances of a domestic violence conviction.

¶26 In applying this framework, we first ask whether there are opportunities in a workplace that would allow a domestic violence perpetrator to recidivate. One such opportunity would be the ability to isolate victims. Perpetrators of domestic violence often commit their crimes under a veil of secrecy inside the home. Indeed, this aspect of domestic violence explains the inclination to treat crimes of domestic violence differently from other violent crimes. And it leads to the misconception that unlike other violent offenders, domestic violence perpetrators are sufficiently

---

[13] The dissent's umbrage with this opinion is misplaced. Really the dissent's contention is aimed at this court interpretation of "circumstances" in Milwaukee County v. LIRC, 139 Wis. 2d 805, 824, 407 N.W.2d 908 (1987). Yet the dissent offers no grounds for overturning this precedent, and for good reason—— to do so would be to develop the parties' arguments for them. See, e.g., Christus Lutheran Church of Appleton v. DOT, 2021 WI 30, ¶21 n.12, 396 Wis. 2d 302, 956 N.W.2d 837. Moreover, for over three decades LIRC has been applying Milwaukee County's interpretation to crimes where domestic violence is not at issue. See, e.g. Weston v. ADM Milling Co., ERD Case no. CR200300025 (LIRC Jan. 18, 2006); McCain v. Favorite Nurses, ERD Case No. 200302482 (LIRC Apr. 27, 2005); Santos v. Whitehead Specialties, Inc., ERD Case No. 8802471 (LIRC, Feb. 26, 1992). This opinion simply ensures that same standard applies consistently to all crimes, including those of domestic violence.

deterred from engaging in violence when in public. However, this pubic versus private, work versus home dichotomy misses the mark. The specific setting of the crime is immaterial; what matters is that the abusers engage in violence under circumstances where their victims are isolated away from those who might intervene.[14] That isolation occurs not just in the home—under the right circumstances, it can be achieved in a car, in a private room, in a storage closet, or in a parking lot. Thus, when considering crimes of domestic violence, we look for the opportunities that may exist within the circumstances of the job that would allow a perpetrator to isolate a victim.

¶27 Next we must identify the character traits revealed by the elements of a crime of domestic violence. Here, we refer to the testimony of Cree's domestic violence expert, Dr. Hanusa, on

---

[14] See Giles v. California, 554 U.S. 353, 380 (2008) (Souter, J. concurring in part) (confirming that the inference drawn from the "classic abusive relationship" is that the abuser means "to isolate the victim from outside help, including the aid of law enforcement and the judicial process").

general principles informing domestic violence offenses.[15] Dr. Hanusa testified that there is "a direct relationship" between "a willingness to use violence in your intimate relationship" and "your willingness to use violence in other settings."  He also pointed out that the best predictor for future violent behavior was past violent behavior.  Put simply, Dr. Hanusa's testimony shows that crimes of domestic violence, like other violent crimes, indicate a character trait of willingness to use violence against others.

¶28  Dr. Hanusa also explained the "power principle," that acts of domestic violence are rooted in power and control.  He further testified that those who have issues with power and control resort to violence when they believe their power or authority is threatened, regardless of who the victim is.  This indicates a character trait of willingness to use violence when one's power and authority is threatened.  Thus, when reviewing the circumstances of the job, we consider whether a domestic violence

---

[15] We reference Dr. Hanusa's testimony not for his opinion on Palmer's particular recidivism risk but instead for his exposition on general principles regarding domestic violence offenders.  See State v. Dobbs, 2020 WI 64, ¶42, 392 Wis. 2d 505, 945 N.W.2d 609 (distinguishing expert opinions about a particular individual from expert expositions on general principles).  This limited reference to his testimony presents no conflict with LIRC finding Dr. Hanusa's testimony "unhelpful"; that determination was not based on credibility——the ALJ "had no specific demeanor impressions to impart"——and faulted only Dr. Hanusa's opinion of Palmer's particular recidivism risk because he had not personally interviewed or treated Palmer.  See Palmer, ERD Case No. CR201502651, at 19.  No fault was found with respect to his exposition on domestic-violence general principles.

perpetrator's power and authority will be threatened in ways that may trigger a violent response.

### B.  Application

¶29  Having defined the substantial relationship test and the proper way to analyze a conviction for a crime of domestic violence within that framework, we now apply that test to Palmer's case. We begin by detailing the circumstances both of Palmer's convictions and of the Applications Specialist position at Cree. We then compare those circumstances and ultimately conclude that Cree met its burden to show a substantial relationship.

### 1.  The circumstances of Palmer's convictions

¶30  First, we look to the character traits evinced by the elements of Palmer's offenses.  Palmer was convicted of two counts of strangulation and suffocation, four counts of battery, one count of fourth degree sexual assault, and one count of criminal damage to property.  Importantly, each offense requires as an element that Palmer acted intentionally.  In addition, the offenses contain the following elements:

- Strangulation and suffocation requires that the defendant impede the normal breathing or circulation of blood by applying pressure on the throat or neck or blocking the victim's nose or mouth;
- Battery requires that the defendant caused bodily harm to the victim without consent;
- Fourth degree sexual assault requires that the defendant had nonconsensual sexual contact with the victim; and

22

- Criminal damage to property requires that the defendant caused damage to property belonging to another without consent.

These elements, informed by the domestic context of the offenses, exhibit the following character traits:

- Willingness to use extreme acts of violence to achieve power and control over another person, particularly when the victim is isolated;

- Willingness to engage in nonconsensual sexual conduct for the purpose of sexual gratification, degradation, or humiliation;

- Willingness to use extreme violence to stop another person's breathing or circulation;

- Disregard for the health and safety of others;

- Lack of respect for bodily autonomy;

- Unwillingness or inability to control anger or other emotions, particularly in the face of a perceived power differential; and

- Disregard for the property rights of others.

This list illustrates far more than a mere tendency to be "anti-social."  See Milwaukee County, 139 Wis. 2d at 831 (Abrahamson, J., concurring) (voicing concern that an emphasis on describing circumstances of an offense too generally could lead to viewing all individuals who have conviction records as "anti-social" "recidivist[s]" fit for few employment positions.).  Palmer's crimes show a tendency to violently exert his power to control

others, and thus Palmer poses a real threat to the safety of others.

¶31 These traits are not overgeneralizations untethered from the circumstances of Palmer's crimes, as the dissent suggests. In every criminal case that results in a conviction, there is a direct link between the elements of an offense and the defendant's particular conduct. Indeed, the traits we have identified here are each borne out by the specific facts of Palmer's offenses. Palmer brutally attacked L.R., physically injuring her, endangering her life, and violating her sexually. No expert is needed to appreciate that these facts demonstrate Palmer's willingness to use extreme violence or his disregard for the health and safety of others.

¶32 In addition to these character traits, we consider other relevant and readily ascertainable circumstances of the offense such as the seriousness and number of offenses, how recent the conviction is, and whether there is a pattern of behavior.[16] We consider the seriousness of the convicted offense because the more serious the offense, the less we can expect an employer to carry the risk of recidivism. See Milwaukee County, 139 Wis. 2d at 823

---

[16] The court in Milwaukee County emphasized the need for "a semblance of practicality about what the test requires. A full-blown factual hearing is not only unnecessary, it is impractical." Milwaukee County, 139 Wis. 2d at 826. These circumstances can be ascertained from the record of conviction itself and thus do not require any "full-blown" hearing. Furthermore, the court in Milwaukee County similarly looked to the "pattern of neglect of duty" evinced by the twelve misdemeanor counts to determine there was a substantial relationship in that case. Id. at 828.

("This law should be liberally construed to effect its purpose of providing jobs for those who have been convicted of crime and at the same time not forcing employers to assume risks of repeat conduct by those whose conviction records show them to have the 'propensity' to commit similar crimes . . . ."). The possible consequences to an employer of hiring a recidivist shoplifter is a matter of petty cash and missing property. The experience may be inconvenient and frustrating but is unlikely to result in any great harm to the employer, its staff, or its customers. In contrast, the possible consequences of an employer hiring someone who has committed strangulation, battery, and sexual assault include a threat to the very safety and bodily autonomy of employees and customers. If harm were to befall a customer or employee, an employer could face potential liability.

¶33 The recentness of the offenses and any pattern of conviction are additional readily ascertainable considerations. If significant time has passed since a potential employee's last conviction, then that tends to indicate rehabilitation and reduces the likelihood of recidivism. But the existence of convictions with similar elements that predate the most recent conviction undermine an inference of rehabilitation, increasing the recidivism risk.

¶34 Thus, in considering these circumstances of Palmer's convictions, we recognize the undeniable seriousness of his offenses and an emerging pattern of behavior. His convictions for battery and sexual assault are themselves grave offenses, but his conviction for strangulation and suffocation is a particularly

25

concerning offense given its association with homicide.   Palmer applied for a job at Cree in 2015, only two years after his multiple 2013 convictions.   Before that, Palmer had an additional domestic battery conviction in 2001, indicating an emerging pattern.

### 2.   The circumstances of Cree's job

¶35   As an Applications Specialist at Cree, Palmer would have been working in and have access to most of Cree's large facility alongside over 1,000 coworkers.   As his place of work, the layout and characteristics of Cree's facility are "accompanying or accessory fact[s], event[s], or condition[s]," of Palmer's particular job with Cree.[17]   See Circumstance, Black's Law Dictionary 306 (11th ed. 2019).   Some portions of the facility are heavily populated but other portions are secluded.   The facility is extremely loud in places, which could cover the sounds of a struggle.   While some portions of the facility are covered by security cameras, the cameras are largely located at entrances and exits and in places where injuries are likely to occur.

---

[17] The dissent misreads Wis. Stat. § 111.335(3)(a)1., suggesting that the circumstances of the "particular job" narrowly means circumstances unique to that particular job.   That "uniqueness" limitation appears nowhere in the statue.   Cree's Racine facility is a circumstance of this particular Application Specialist job, in the way that a different facility where a different Application Specialists might work is not particular to the position Cree offered Palmer.   That other employees in other jobs at Cree might share the same space does not change the fact that the shared facility is a circumstance of this particular Applications Specialist job.   Nor does it matter that Cree "expected" an Applications Specialist to be in a particular part of the facility; the record is clear that, despite the expectation, Palmer could still access much of the facility.

¶36 The Applications Specialist position works largely independently and with no day-to-day supervision. Palmer would have been expected to interact with co-workers and customers regularly. By providing pre and post sales customer support, Palmer would have been subject to deadlines and responsible for satisfying customer demands. Because of the independent nature of his position, he would have been expected to provide some level of conflict resolution between Cree and its customers.[18] Applications Specialists must occasionally assist customers at their facilities in uncontrolled and unpredictable environments. For example, they work with "industrial accounts . . . building new facilities, such as an office building, a school, a retail establishment, or an automotive dealership[.]" Palmer, No. 201502651, at 12. Trade shows would have required Palmer to travel with no supervision, giving him access to rental cars and hotel rooms. Id. at 4.

### 3. The substantial relationship

¶37 Based on the evidence Cree submitted, the circumstances of Palmer's convictions substantially relate to the Applications Specialist position in at least two regards. First, Palmer's willingness to use violence to exert power and control over others substantially relates to the independent and interpersonal nature of a pre and post sales job like the Applications Specialist position. The relevant circumstances of the Applications

---

[18] The Application Specialist job posting stated that the job performs a "mixture of design, presales and post sales customer support responsibilities[,]" and would be "part of a team, [] applying project management skills to drive your own projects to completion." Palmer, No. 201502651, at 3-4.

27

Specialist position would have presented situations where Palmer's power or authority could have been threatened. Palmer would have been responsible for designing an appropriate lighting system for Cree's customers and responding to their complaints, problems, and demands. Furthermore, in this situation, he was likely going to interact with coworkers and supervisors who may have challenged his ideas or perceived authority. These kinds of challenges and demands could lead Palmer to react, consistent with his past behavior, in a violent manner in order to exert his own power or control.

¶38 Second, the absence of regular supervision creates opportunities for violent encounters. LIRC's decision in this case emphasized that unsupervised contact with other people cannot in and of itself be a circumstance that might lead someone to violent recidivism. This is true, but it is not just the unsupervised contact with others that creates the substantial relationship in this case. The lack of supervision is bolstered by the secluded nature of portions of the large facility, the covering noise in portions of the facility, and the broad opportunities afforded to Palmer when working with clients on location or traveling for trade shows. Palmer's conviction record evinces a propensity to use violence to exert power and control over others, particularly when they are isolated and unable to attain help. Cree's Racine facility offers sufficient opportunities for Palmer to either encounter a victim in isolation or to intentionally isolate someone in one of the secluded, noisy portions of the facility that experience little foot traffic.

28

Furthermore, traveling to customer sites or for trade shows provides more significant opportunities to isolate and victimize someone.

¶39 Several other factors also weigh in favor of finding a substantial relationship. First, the seriousness of Palmer's convictions would force Cree to assume the risk of Palmer repeating his conduct and threatening the safety of employees, customers, and the public. Additionally, the recentness of Palmer's convictions——a scant two years——eliminates any favorable inference of a long-dormant conviction record. Finally, Palmer's emerging pattern of domestic violence convictions further highlight his recidivism risk.

¶40 When we consider the fostering opportunities for conflict and violence in light of the character traits shown by Palmer's convictions along with the seriousness, relative recentness, and emerging pattern to Palmer's crimes, we conclude that Cree met its burden to show a substantial relationship between Palmer's convicted offenses and the Applications Specialist position. Palmer's willingness to use violence to exert power and control over others substantially relates to the independent and interpersonal circumstances of the position, the layout of the facility——which provides sufficient opportunities to isolate a victim——and the opportunities created by unsupervised travel. To be abundantly clear, this holding is based on the specific circumstances of Palmer's convictions and this particular Applications Specialist job. Nothing in this opinion condemns all domestic violence offenders to a life of unemployment. But in

29

this case, Cree sufficiently demonstrates that requiring it to employ Palmer would force it to carry too much risk relating to his recent criminal behavior.

## IV.  CONCLUSION

¶41  We hold that Cree met its burden to establish a substantial relationship between the circumstances of Palmer's convicted offenses and the circumstances of the Applications Specialist position.   Accordingly, Cree did not unlawfully discriminate against Palmer based on his conviction record. Because LIRC's contrary conclusion conflicts with our prior direction on how to apply the substantial relationship test, we remand to the circuit court with instructions to remand the matter to LIRC with direction to dismiss Palmer's complaint on the merits.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court with instructions.

¶42 REBECCA FRANK DALLET, J. (*dissenting*). The text of Wis. Stat. § 111.335 prohibits discrimination on the basis of an applicant's conviction record unless the circumstances of the applicant's offenses are substantially related to the circumstances of the particular job he seeks. The majority ignores that context-specific directive, focusing instead on generic "character traits," as well as the general qualities of the workplace, gutting the anti-discrimination policy of the Fair Employment Act in the process. The court should instead realign its interpretation and application of § 111.335(3)(a)1. with the statute's actual text and express purpose. Under such an analysis, Cree unlawfully discriminated against Palmer because it failed to show that the circumstances of Palmer's offenses are substantially related to the circumstances of the lighting-specialist job for which he applied. I therefore respectfully dissent.

I

A

¶43 The Fair Employment Act makes it illegal, generally, for employers to refuse to hire an applicant based on the applicant's criminal record. Wis. Stat. § 111.321. Notwithstanding that general prohibition, the legislature has carved out a number of "exceptions and special cases." Wis. Stat. § 111.335. Some exceptions target specific jobs; for instance, an employer may lawfully refuse to hire "as an installer of burglar alarms" anyone convicted of a felony. § 111.335(3)(c). Some target certain employers, such as an "educational agency," allowing them to

1

lawfully discriminate against persons convicted of a felony. § 111.335(3)(e). Other exceptions target specific crimes, permitting the lawful discrimination against an applicant who was convicted of "knowingly us[ing] a false academic credential" or "falsely claiming to have a legitimate academic credential." §§ 111.335(3)(f), 440.52(13)(c).

¶44 In addition to those targeted exceptions, the legislature enacted a broader exception that applies when the applicant has been convicted of any offense "the circumstances of which substantially relate to the circumstances of the particular job." § 111.335(3)(a)1. Although we have addressed this exception in prior cases, we have never defined "circumstances" or "substantially relate" in the context of § 111.335. Because those words are also not defined in the Fair Employment Act, I look to their common meanings. See Clean Wis., Inc. v. DNR, 2021 WI 72, ¶22, 398 Wis. 2d 433, 961 N.W.2d 611. A "circumstance" is a "detail accompanying or surrounding an event"; a "fact attending an event and having some bearing on it."[1] A "relation" is a "connection" or "logical or natural association between two or more things."[2] And "substantial" means to a "considerable . . . degree."[3] Thus, § 111.335(3)(a)1. applies when the details and attending facts surrounding both the applicant's prior offense and potential job are connected to a considerable degree.

---

[1] E.g., Am. Heritage Dictionary 347 (3d ed. 1994).

[2] Id. at 1523.

[3] Id. at 1791.

2

¶45 That definition is consistent with the Fair Employment Act's express anti-discrimination purpose. See State v. Jendusa, 2021 WI 24, ¶24, 396 Wis. 2d 34, 955 N.W.2d 777 (statutes must be interpreted in line with their purpose). The legislature directed courts to "liberally construe[]" the Act so as to "encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of . . . conviction record." Wis. Stat. § 111.31(3). It therefore follows that we must narrowly construe exceptions such as § 111.335(3)(a)1. so that they do not swallow the Act's anti-discrimination rule. See McNeil v. Hansen, 2007 WI 56, ¶10, 300 Wis. 2d 358, 731 N.W.2d 273 ("If a statute is liberally construed,' . . . exceptions must be narrowly construed.'") (quoted source omitted). To that end, the employer must show that the "circumstances" of the offense referenced in § 111.335(3)(a)1. are closely tethered to the specific facts of the applicant's conviction, not to general characteristics that may or may not apply to this particular applicant. See Gibson v. Transp. Comm'n, 106 Wis. 2d 22, 29, 315 N.W.2d 346 (1982) (the burden of proof is on the employer). The employer must also prove that the connection between the particular circumstances of the applicant's offenses and those of the job is strong and specific, not tenuous and general. See § 111.335(3)(a)1.

¶46 Despite those clear textual directives, the court has generally struggled to follow them. Of the three cases in which

3

the court has previously interpreted § 111.335(3)(a)1.,[4] only once has our interpretation been true to the text. In that case, LESB v. Village of Lyndon Station, 101 Wis. 2d 472, 305 N.W.2d 89 (1981), William Jessen had applied to be Lyndon Station's chief of police, a job for which one of the primary responsibilities was enforcing local traffic laws. Id. at 492. Jessen, however, had previously been convicted of 26 felony counts of misconduct in public office for falsifying traffic tickets while he was the chief deputy sheriff for Juneau County. Id. at 476. We concluded that the particular details surrounding Jessen's specific offense——that he wrote false traffic tickets while serving as a deputy sheriff——were closely and strongly connected to the position of chief of police such that it was not unlawful discrimination for Lyndon Station to refuse to hire Jessen:

> [U]nder the facts of this case, it can hardly be said that the circumstances of the offense for which Jessen was convicted fail to meet the substantial relationship exception [in the Fair Employment Act], as common sense dictates that a conviction of the felony of misconduct in public office for falsifying traffic tickets certainly bears a substantial relationship to the duties of a police officer who is called upon to issue traffic citations.

Id. at 492. Consistent with the statute's narrow focus, we did not consider the general "character traits" of a person who commits misconduct in public office. Nor did we consider the general work environment of Lyndon Station's police department. Instead, we

---

[4] Although it has not always been numbered § 111.335(3)(a)1., the relevant text of the statute has been the same since 1977, when the conviction-record basis was added to the Fair Employment Act's prohibited bases for discrimination. See Wis. Stat. § 111.32(5)(h)2.a. (1977–78).

4

focused on the relationship between the facts surrounding Jessen's convictions and the job of a police chief.

¶47 Contrast that textual analysis, rooted in the facts of the case, with our two more recent decisions interpreting § 111.335. In Gibson v. Transportation Commission, 106 Wis. 2d 22, 315 N.W.2d 346 (1982), and Milwaukee County v. LIRC, 139 Wis. 2d 805, 407 N.W.2d 908 (1987), we concluded that certain character traits are inherent in the elements of a crime such that everyone who commits that crime necessarily has those traits. In both cases, the court divined these character traits from nothing but its own judgment——not record evidence, not expert testimony, not a statutory provision. See Gibson, 106 Wis. 2d at 28; Milwaukee County, 139 Wis. 2d at 828. In Gibson, for instance, the court flatly asserted that anyone who commits armed robbery has a "propensity to use force . . . to accomplish one's purposes," as well as a lack of "patience [and] level-headedness." 106 Wis. 2d at 28. While some people who commit armed robbery undoubtedly posses these qualities, the same cannot be assumed of every person who commits that crime. Concluding otherwise requires the court to play armchair psychologist, making assumptions about what character traits might be associated with each particular criminal offense.

¶48 Followed to its logical end, an analysis rooted in generic "character traits" obliterates the express policy of the Fair Employment Act. The Act is meant to "encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of . . . conviction record." See Wis. Stat. § 111.31(3). It further requires employers to evaluate

5

an applicant based upon the applicant's "individual qualifications . . . rather than upon a particular class to which the individual may belong." § 111.31(2). Neither of those policy statements can be squared with an analysis focused on general character qualities rather than the specific circumstances of the case at hand. Indeed, Justice Abrahamson presciently sounded the alarm 35 years ago about the consequences of the atextual "character traits" approach:

> I fear that what may emerge from the majority opinion is an emphasis on describing the circumstances of the offense at a high level of generality. At the highest level of generality, according to the majority opinion, an individual convicted of a crime is an "anti-social" "recidivist," and anti-social recidivists are fit for few employment positions. Clearly the majority cannot have intended this approach because such an approach tends to eviscerate the statute.

Milwaukee County, 139 Wis. 2d at 831-32 (Abrahamson, J., concurring). To prevent the Act's exceptions from eviscerating its anti-discriminatory purpose, the court should return to the text of § 111.335(3)(a)1. and analyze whether the actual circumstances of an applicant's offense are substantially related to those of the job for which he applied.

B

¶49 Under the proper text-based approach, Cree failed to prove a substantial relationship between the circumstances of Palmer's offenses and those of the lighting-specialist position. Regarding the circumstances of Palmer's offenses, the record before LIRC included the criminal complaint, which described the horrifying facts underlying Palmer's convictions for strangulation

6

and suffocation, battery, sexual assault, and damaging property. See majority op., ¶¶2-3. As for the circumstances of the lighting-specialist job, LIRC found that the position would require Palmer primarily to design lighting systems for clients.[5] Within the company, lighting specialists work on teams with other specialists and coordinate project designs with teams of engineers. They also interact directly with customers, "most[ly]" by phone and email but "occasionally" in person either at the company's demonstration rooms, "on the trade show floor" (requiring travel to the trade show), or in "other industrial setting[s]." Palmer v. Cree, Inc., No. 201502651, at 4, 12 (LIRC, Dec. 3, 2018). LIRC found "no evidence" that Palmer would be "supervising or mentoring female employees, nor is there anything to suggest that he would be working closely with female employees." Id. at 12. It also found "nothing in the record" indicating that Palmer would interact with customers in "private homes or other isolated settings." Id.

¶50 Based on the circumstances as found by LIRC, Cree has failed to establish a strong connection between the circumstances of Palmer's offenses, despicable as they are, and the circumstances of the lighting-specialist position. Lighting specialists work in a "cubicle farm," not in an isolated or secluded area. See id. at

---

[5] The circumstances of both the offense and the particular job are factual determinations. See State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 ("Findings of fact include 'the circumstances of the case . . . .'") (quoted source omitted). We must therefore defer to LIRC's findings unless no reasonable fact finder could have made the same determination. Milwaukee Symphony Orchestra, Inc. v. DOR, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674. As the court of appeals noted, Cree does not challenge LIRC's factual findings. Cree, Inc. v. LIRC, 2021 WI App 4, ¶10, 395 Wis. 2d 642, 953 N.W.2d 883.

4. Client meetings take place either in the company's demonstration rooms or in public settings, such as the trade-show floor or "an office building, a school, a retail establishment, [or an] automotive dealership" where the lighting system will eventually be installed, not individuals' homes or isolated settings. See id. at 12. It is true that Palmer's offenses involved a violent assault on a woman and the lighting-specialist position would require Palmer to interact with co-workers and clients, some of whom will be women. But as LIRC pointed out, interacting with others, including women, is not a circumstance of this particular job, but rather a circumstance of having a job generally. See id. at 11-12.

¶51 Moreover, no single circumstance of a person's offense is dispositive. The domestic nature of Palmer's offenses is just one of many circumstances that informs the substantial-relationship analysis, all of which must be considered to determine whether the circumstances of the offense are in fact substantially related to those of the job. Thus, when the relevant offenses "stem from personal relationships and the crimes are committed at home, it cannot necessarily be assumed that the individual is likely to engage in the same conduct with co-workers or customers at the workplace." See id. at 13 (emphasis added). It was Cree's burden to prove otherwise, a burden that LIRC concluded Cree failed to meet: "[T]here is nothing in the record regarding the types of interactions with co-workers or with the public that might raise a concern that [Palmer] would act in a violent manner." Id. at 12-13. Indeed, to conclude that there is a substantial relationship in this case would be to say that the "mere presence

8

of other human beings is a circumstance that creates a substantial relationship." See id. at 13. LIRC rightly rejected such a conclusion as contrary to the Fair Employment Act and correctly determined that Cree unlawfully discriminated against Palmer on the basis of his conviction record.

## II

¶52 The majority's contrary holding undermines the anti-discrimination policy of the Fair Employment Act by allowing employers to refuse to hire all domestic-violence offenders, regardless of the circumstances. Instead of focusing on the specific circumstances of Palmer's offenses, the majority redefines "circumstances of the offense" to mean the "general character traits" it claims are somehow "revealed by the elements of a crime of domestic violence." See majority op., ¶27. Similarly, rather than analyzing the particular circumstances of the lighting-specialist position, the majority relies upon generalities about Cree's work environment. The majority arrives at these conclusions by failing to follow the proper standard of review, improperly substituting its own factual findings for LIRC's. The result is a substantial-relationship analysis that is unrecognizable in the text or the explicit policy of the Fair Employment Act.

## A

¶53 The majority gets off on the wrong foot by ignoring the standard of review. The court must defer to LIRC's findings of fact, including the circumstances of both Palmer's convictions and

9

the lighting-specialist job, as well as its weight and credibility determinations unless no reasonable fact finder could reach the same conclusions. See Milwaukee Symphony Orchestra, Inc. v. DOR, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674. For that reason, the majority's reliance on the testimony of Cree's expert witness, Dr. Hanusa, is improper. LIRC found Dr. Hanusa's testimony "unhelpful" and gave it no weight in its analysis. See Palmer, No. 201502651, at 13 n.6. LIRC made no exception for Dr. Hanusa's "exposition on general principles regarding domestic violence offenders." See majority op., ¶27 n.15. Thus, Dr. Hanusa's testimony is not properly before the court, and the majority may not rely on it for any purpose. The majority also inappropriately relies on Cree's assertions that Palmer would be expected to interact with customers one-on-one in "uncontrolled and unpredictable environments" and to "provide some level of conflict resolution between Cree and its customers." See id., ¶36. LIRC found "nothing in the record" to support any of those assertions. See Palmer, No. 201502651, at 12 ("the conclusion that [Palmer] would be meeting one-on-one with clients in private settings is not supported by the record"); id. ("There is nothing in the record to suggest that [Palmer] would be performing his services in private homes or other isolated settings, nor did [Cree] specify that the on-site meetings with clients would be conducted one-on-one."); id. (Cree "did not contend that [Palmer] would be required to deal with angry or irate customers or that there were any conflicts presented in his relationships with the public."). The majority identifies no error by LIRC on any of these points; therefore it cannot substitute its own factual findings for LIRC's.

10

B

¶54 The majority continues down the wrong path by ignoring the text of the Fair Employment Act. Under § 111.335(3)(a)1., Cree's decision to not hire Palmer is lawful only if there is a substantial relationship between the circumstances of his offenses and those of the lighting-specialist position. The majority gets each part of that analysis wrong: it recasts circumstances of the offense as general character traits; it over-generalizes the circumstances of the job; and it invents a substantial relationship between the two.

¶55 Beginning with the circumstances of Palmer's offenses, the majority fails to consider Palmer's conduct and other facts of his offenses as the relevant circumstances. Instead, it shifts the meaning of "circumstances" to include whatever general "character traits" Dr. Hanusa testified to and those it conjures from the elements of Palmer's crimes. See majority op., ¶¶27-28, 30-31. Not only is the court unqualified to divine psychological traits from conduct, but, as discussed above, such general characterizations are incompatible with the Fair Employment Act's requirement that employers evaluate applicants based on their "individual qualifications," not on the general group to which the applicant may belong. See §§ 111.31; 111.335(3)(a)1. Also, general character traits that may be common to most persons who commit certain crimes are neither attending facts nor surrounding

11

details of a <u>specific</u> person's offenses——especially when, as here, there is no evidence that the offender actually has such traits.[6]

¶56 To boot, the majority identifies character traits at such a high level of generality that they likely substantially relate to the circumstances of most <u>any</u> job, thus establishing a hurdle that no person with a conviction record is likely to clear. For example, the majority asserts that anyone who commits the same crimes as Palmer necessarily exhibits a "disregard for the health and safety of others." <u>See</u> majority op., ¶30. I can think of no job to which a respect for the health and safety of others is not substantially related. Such a total prohibition on employment for individuals convicted of offenses such as Palmer's must be rejected. <u>See</u> <u>Milwaukee County</u>, 139 Wis. 2d at 831-32 (Abrahamson, J., concurring).

¶57 Moving even further away from the text of § 111.335(3)(a)1., the majority claims that the "recentness" of Palmer's convictions and his "emerging pattern" of criminal behavior are circumstances of his offenses. <u>See</u> majority op., ¶¶32-34. In reality, however, both are just different ways of talking about general character traits rather than the facts of Palmer's offenses. To be sure, the date of the offense is a fact of that offense, but how much time has passed since that date is not. Likewise for the majority's argument about a pattern of conduct. Setting aside the point that no party raised that argument, the number of times someone has been convicted of a crime

---

[6] Even if Dr. Hanusa's testimony were properly before the court, nowhere does he testify that Palmer actually has any of the general character traits he describes.

12

says nothing about the details surrounding any of those offenses. And there is no logical relationship between how long ago or how many times Palmer has been convicted and the job responsibilities of a lighting specialist.  At bottom, few if any of what the majority claims as circumstances of Palmer's offenses are, in fact, circumstances of those offenses.

¶58  The majority's approach to the circumstances of the lighting-specialist job is similarly flawed.  Again failing to focus on the particular circumstances of that position, the majority falls back on high-level generalities, identifying generic characteristics of employment at Cree.  For instance, the majority notes the size of Cree's facility and the fact that most employees have "access" to most of the facility.  See majority op., ¶¶4, 35.  But there is nothing in the record to suggest that, as a lighting specialist, Palmer would be expected to access the whole of Cree's facility.  Rather, the record establishes that lighting specialists typically work in a cubicle farm or, when meeting clients face-to-face at Cree's facility, in the company's demonstration rooms.  The so-called "nooks and crannies" of Cree's expansive facility, see id., ¶4, are no more a circumstance of the lighting-specialist position than all parts of Mitchell International Airport are a circumstance of working for a food vendor there.  Indeed, the text of § 111.335(3)(a)1. explicitly precludes such a broad reading.  See § 111.335(3)(a)1. (focusing on the circumstances of the "particular job").  And even when the majority points to an actual circumstance of the job——such as the potential for Palmer to travel to trade shows——it fails to explain

13

how such a generic and mundane fact informs the substantial-relationship test.[7]

¶59 Given its errors regarding the relevant circumstances of Palmer's offenses and the lighting-specialist job, it is no surprise that the majority gets the ultimate substantial-relationship conclusion wrong. But worse than just getting it wrong the majority opinion threatens the anti-discrimination policy at the heart of the Fair Employment Act by concluding that individuals convicted of crimes of domestic violence are unfit to work in close proximity to other people, regardless of the circumstances. For example, the majority claims that employing someone with Palmer's convictions could lead to certain negative consequences for employers. See majority op., ¶32. But that is whole point of the Fair Employment Act. The Act is premised in part on the idea that, left to their own devices, few employers would hire convicted criminals, especially those convicted of violent crimes, a scenario that the legislature has determined "substantially and adversely affects the general welfare of the state." § 111.31(1). Accordingly, the legislature made the policy decision that unless an employer can demonstrate a substantial relationship between the circumstances of this applicant's convictions and this particular job, it is prohibited from discriminating against the applicant on the basis of his conviction record. § 111.335(3)(a)1.

---

[7] While traveling to trade shows is a circumstance of the lighting-specialist position, the fact that Palmer would have "access to rental cars and hotel rooms" is not. See majority op., ¶36. He has "access" to both regardless of where he works.

14

¶60 In no way does that policy determination excuse an applicant's convictions or diminish their offensiveness. Rather, it reflects the Act's goals of reintegrating into the workforce individuals convicted of crimes and furthering their rehabilitation, thus lessening the chances they will commit more crimes. See Milwaukee County, 139 Wis. 2d at 823. Whether or not the majority considers that "to be a wise policy decision," it is one "the legislature was entitled to make and to which [the court] must defer." See Kohn v. Darlington Cmty. Schs., 2005 WI 99, ¶43, 283 Wis. 2d 1, 698 N.W.2d 794.

¶61 The majority opinion, however, suggests a different approach for domestic-violence offenders such as Palmer. It instructs LIRC and reviewing courts to ignore the circumstances related to "the domestic context of the offense or an intimate relationship with the victim" and instead focus on the general character traits supposedly "revealed" by a domestic-violence conviction. See majority op., ¶25.[8] Through that framing, the majority creates a per se substantial relationship between a domestic-violence conviction and the circumstances of any job that involves working with other people. That reasoning seemingly extends to all violent convictions, creating a per se substantial

---

[8] Ironically, given its insistence that LIRC and reviewing courts analyze a domestic-violence conviction "the same way [they] would . . . any other conviction," majority op., ¶25, the majority's position requires LIRC and reviewing courts to do the opposite. It forces them to disregard the domestic circumstance of a domestic-violence offense, thereby treating such offenses differently than any other. The majority's approach is also a solution in search of a problem. As explained above, supra, ¶¶9-10, LIRC analyzed Palmer's offenses as it would any other, by considering all of the relevant circumstances of the offenses.

15

relationship between <u>any</u> such conviction and any job involving other people. In short, the majority crafts an exception to the Fair Employment Act that swallows the Act's general rule against such discrimination.

¶62 The text of § 111.335, however, proscribes the majority's position in two ways. First, a categorical exception for domestic-violence convictions would render meaningless the textual directive that LIRC and reviewing courts must consider the "circumstances" of each particular offense. <u>See</u> § 111.335(3)(a)1. Second, had the legislature wanted to enact such a categorical exception to the Act's protections, it would have done so, just as it did it elsewhere in § 111.335. Under subsec. (4)(a), for example, a licensing agency may lawfully discriminate against a potential licensee if, in addition to meeting the same substantial-relationship test as in § 111.335(3)(a)1., the licensee's conviction was for either "an exempt offense" or a "violent crime against a child." An "exempt offense" is defined as any crime listed in ch. 940 ("Crimes against life and bodily security") or certain crimes against children. <u>See</u> § 111.335(1m)(b). The legislature included no similar categorical exception for employers regarding domestic-violence convictions.

¶63 It likewise declined to single out domestic-violence convictions under any of the specific "exceptions and special cases." As mentioned above, no employer is required to hire as a burglar-alarm installer anyone convicted of any felony. § 111.335(3)(c). All private-investigation firms are allowed to lawfully discriminate against anyone convicted of any felony. § 111.335(3)(b). The legislature enacted no such exception for

16

any of the crimes Palmer committed. The lack of a categorical exception for domestic-violence convictions doesn't mean that Cree was required to hire Palmer; only that because it didn't hire him based on his criminal record, the substantial-relationship test applies. See § 111.335(3)(a)a. The majority's interpretation, however, essentially eliminates that test for applicants with domestic-violence convictions.

III

¶64  The text of § 111.335(3)(a)1. is straightforward and clear. If an employer wants to discriminate against an applicant or employee due to that person's conviction record, it must demonstrate a substantial connection between the factual details surrounding the person's convictions and the circumstances of the particular job for which the person is applying. Here, LIRC correctly determined that Cree failed to establish such a connection between Palmer's convictions and its lighting-specialist position. The majority's erroneous conclusion to the contrary has no basis in the text of the Fair Employment Act and undermines the Act's express policy of promoting the reintegration into the workforce of those who have been convicted of crimes.

¶65  I am authorized to state that Justices ANN WALSH BRADLEY and BRIAN HAGEDORN join this opinion.

17